UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

HADEEL J.,

                    Plaintiff,

        v.

NANCY BERRYHILL, Deputy
Commissioner of Social Security for
Operations,

                    Defendant.

CASE NO. 2:18-cv-00050-JRC

ORDER ON PLAINTIFF'S
COMPLAINT

    This Court has jurisdiction pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and Local

Magistrate Judge Rule MJR 13. *See also* Consent to Proceed Before a United States Magistrate

Judge, Dkt. 2. This matter has been fully briefed. *See* Dkts. 10 and 13.

    After considering and reviewing the record, the Court finds the ALJ appropriately (1)

concluded that plaintiff's polyneuropathy impairment was not severe; (2) excluded the need for a

cane or rolling walker from plaintiff's residual functional capacity; and (3) identified sufficient

numbers of jobs plaintiff could perform in the national economy in spite of English limitations.

Therefore, this matter is affirmed pursuant to sentence four of 42 U.S.C. §405 (g).

## BACKGROUND

Plaintiff, Hadeel J., was 25 years old on August 1, 2014, the alleged date of disability onset. *See* AR 139. Plaintiff went to school until the seventh grade while living in Iraq, and took classes in English as a second language for two and a half months after moving to the United States in 2012. AR 42-43 and 139. Although there is evidence showing plaintiff has at times used an interpreter, she testified that she knows some English. *See* AR 43. She worked part time packaging and shipping items for a delivery company from October 2013 to November 2013, and worked part time as a home health caretaker from April 2014 to July 2014. AR 164, 199, and 44. Plaintiff alleges that she left her job as a home health caretaker due to diabetes and the onset of pain in her back. AR 44. At the time of the application for disability benefits, plaintiff lived with her husband and their two young children then ages one and four, the older of whom has special needs. AR 140. According to the ALJ, plaintiff has at least the severe impairments of degenerative disc disease, depressive disorder, and somatoform disorder. AR 12.

## PROCEDURAL HISTORY

Plaintiff's application for Supplemental Security Income ("SSI") benefits pursuant to 42 U.S.C. § 1382(a) (Title XVI) of the Social Security Act was denied initially and upon reconsideration. AR 80 and 89. Plaintiff thereafter appeared and testified at a hearing before Administrative Law Judge Kimberly Boyce ("the ALJ") on September 20, 2016. On November 2, 2016, the ALJ issued a written decision concluding that plaintiff was not disabled pursuant to

the Social Security Act. *See* AR 10-21. AR 14. Plaintiff requested review of the ALJ's decision, and the Social Security Administration Appeals Council denied plaintiff's request for review on November 8, 2017 (AR 1), making that decision the final agency decision subject to judicial review. On January 17, 2018, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. Dkt. 4.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (*citing Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999)).

## DISCUSSION

Plaintiff seeks reversal of the ALJ's decision and remand for an award of benefits, arguing the ALJ erred by: (1) finding that plaintiff's polyneuropathy is not a severe impairment; (2) finding that plaintiff does not require an assistive device to stand and walk and that plaintiff could stand and walk six hours in a work day; and (3) failing to properly account for plaintiff's limited English proficiency and other limitations in concluding she could perform work that exists in significant numbers in the national economy.  *See* Dkt. 10.

**1.  The ALJ's Finding that Plaintiff's Polyneuropathy was not a Severe Impairment**

Step-two of the Social Security Administration's evaluation process requires the ALJ to determine if the claimant "has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289-90 (9th Cir. 1996) (citation omitted). The step-two

determination of whether or not a disability is severe is merely a threshold determination, raising potentially only a "prima facie case of a disability." *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999)). In the present case, the ALJ determined that the record supports a diagnosis of polyneuropathy, but found that the impairment was not severe. AR 12-13. Plaintiff contends the ALJ erred in finding that her polyneuropathy was not a severe impairment, and that her polyneuropathy causes greater limitations than adopted in the ALJ's analysis of her residual functional capacity.

An impairment is "not severe" if it does not "significantly limit" the ability to conduct basic work activities. *See* 20 C.F.R. § 416.920 (c). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (*quoting Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988).

Here, the ALJ relied on a series of treatment notes from late 2014 to assess the severity of plaintiff's polyneuropathy. These treatment notes generally expressed intact functionality and physicians' doubts about the severity and/or cause of plaintiff's alleged symptoms. *See* AR 12-13 (*citing* AR 209-28, 246, 248, and 262-64). On October 3, 2014 William Harris Likosky, MD saw plaintiff at the request of her primary care physician for an opinion regarding neuropathy. AR 249. Dr. Likosky noted that plaintiff's neurological physical exam was challenging "as it is highly functional." AR 251. According to Dr. Likosky, plaintiff's balance and gait were "impaired by weakness and what appears to be pain." AR 251. Although she displayed distal and proximal weakness, Dr. Likosky noted that her "exertion is only partial as with effort she can squeeze her hand much better than she demonstrates initially[,]" and he noted that "[t]he variability in exertion argues for a major component of functionality." *Id*. Dr. Likosky concluded

that the nature and cause of plaintiff's weakness is not clear, and asked that she be admitted for her worsening state and to rule out cord lesion. AR 252.

On the same day, plaintiff was seen by Alan James Verlander, MD. Plaintiff presented with two and a half months of leg and arm numbness, weakness, and pain, as well as lower back pain, incontinence, and double vision. Dr. Verlander noted that plaintiff's symptoms suggest polyneuropathy, but that her exam was highly functional, and that he was "highly suspicious of presentation." AR 209. The next day, Dr. Verlander completed a discharge summary, noting that he urged plaintiff to remain as an inpatient to complete further diagnostic testing. While his discharge notes list a diagnosis of "neuropathy," Dr. Verlander stressed the need of diagnostic testing to evaluate neuropathy and to rule out a critical cause such as spinal cord compression. Although he explained that leaving without further evaluation carried the risk of permanent paralysis and death, plaintiff expressed that she had to leave because there was no one else to take care of her children. AR 215.

On November 18, 2014, plaintiff underwent a neurology exam with William Ellis Berg, MD. AR 262-264. After completing diagnostic testing, Dr. Berg reported no evidence of a right sciatic neuropathy, peroneal neuropathy, acute axonal L2-S1 radiculopathy, nor peripheral neuropathy in the legs. AR 264. Although he noted "there were several muscles with no demonstrated voluntary units on the needle exam," he opined, "[t]his appears to have been a volitional issue. . . ." While not ruling out a prior nerve injury, he concluded there was "no evidence of an active nerve injury." *Id*.

On December 1, 2014, Dr. Likosky reported a follow up visit with plaintiff to go over her EMG results and to discuss her worsening numbness. Plaintiff reported weakness, feeling bad, and urinary incontinence. Dr. Likosky noted that although plaintiff described a fairly severe

paresthetic status and weakness, "a portion of her weakness may be related to inadequate effort but as always some uncertainty remains." AR 248. Dr. Likosky noted that her EMG showed no overt abnormalities, and that he discussed plaintiff's condition with his inpatient team and with Dr. Berg, "who feel her effort is the issue." AR 246. The treatment reports by Dr. Berg, Dr. Likosky, and Dr. Verlander all tend to suggest that plaintiff's neuropathy is not the cause of her symptoms, and therefore has no more than a minimal effect on plaintiff's ability to work. In light of these treatment reports, substantial evidence supports the ALJ's finding that plaintiff's neuropathy is not severe.

Plaintiff contends the ALJ ignored Dr. Verlander's October 4, 2014 neuropathy diagnosis and his grave warnings regarding the risks of leaving without further attention. Dkt. 10 at 4-5. Plaintiff argues that if her condition were not severe, neither Dr. Verlander nor Dr. Likosky would have insisted on a course of action as extreme as inpatient treatment. Dkt. 10 4-5 (*citing* AR 213-215); Dkt. 10 at 7 (*citing* AR 251-252). However, there is a reasonable inference that the gravity of Dr. Verlander and Dr. Likosky's recommendations relate to the urgent need for further testing to rule out critical causes for plaintiff's condition; and are not expressions as to the severity of plaintiff's polyneuropathy. Plaintiff later obtained diagnostic testing, which showed benign results. *See* AR 262-264.

Plaintiff further contends that the ALJ erroneously interpreted raw medical evidence in finding her polyneuropathy impairment non-severe. Plaintiff argues the ALJ solely relied on clinical findings, and did not cite interpretation by medical professionals consistent with a finding that plaintiff's polyneuropathy is non-severe. Judges have been cautioned to resist the temptation to play doctor because lay intuitions about medical phenomena are often wrong. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). However, the ALJ is responsible for

resolving ambiguities and conflicts in the medical evidence. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

Here, while the ALJ cited some clinical findings regarding plaintiff's reflexes, the ALJ also cited physician interpretations casting doubt on the severity of plaintiff's polyneuropathy. *See* AR 12 *citing* treatment notes at 209, 264, 246, and 248. As noted, Dr. Likosky, Dr. Berg, and Dr. Verlander all expressed doubt as to plaintiff's polyneuropathy; both Dr. Berg and Dr. Likosky noted inadequate effort as a possible explanation for plaintiff's weakness. Unlike raw clinical findings, such as plaintiff's performance on reflex testing, these interpretations discuss in lay terms doubts as to whether polyneuropathy is the cause of plaintiff's symptoms. Thus, it was within the ALJ's responsibility to credit the interpretations by Dr. Likosky, Dr. Berg, and Dr. Verlander. This Court is not inclined to reinterpret the data to reach a different result.

Lastly, plaintiff contends that the ALJ's finding regarding her polyneuropathy is not consistent with diagnoses of neuropathy or polyneuropathy throughout the record. Plaintiff cites a May 5, 2015 function report issued by her primary care physician Elizabeth Stover, MD, which notes a diagnosis of peripheral neuropathy with weakness and lists some limitations including limited ability to lift heavy objects or stand for long periods. *See* AR 265. Although Dr. Stover's function report describes limitations that would have more than a minimal effect on plaintiff's ability to work, it was appropriate for the ALJ to resolve the conflicting medical evidence as to the severity of plaintiff's polyneuropathy. As noted, the ALJ is responsible for resolving ambiguities and conflicts in the medical evidence. *See Reddick*, 157 F.3d at 722. When the opinion from a treating doctor is contradicted by other medial opinions, the treating doctor's opinion can be rejected "for specific and legitimate reasons that are supported by substantial

evidence in the record." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (internal citations omitted).

Here, the ALJ gave little weight to Dr. Stover's opinion because it is inconsistent with Dr. Stover's own treatment reports and because of several other inconsistencies throughout the record. AR 16 and 18. Among these inconsistencies, the ALJ cited a January 7, 2015, report wherein plaintiff sought treatment presenting with bilateral leg weakness and numbness, among other problems. AR 242. Mary E. Reif, MD noted that plaintiff arrived with a cane in her right hand, and was a bit bent forward over the cane, but in general showed "a normal ability to walk." Dr. Reif continued, "[h]owever, when I asked her to do any kind of strength testing, she puts out so little effort that she would not be able to even stand up if she had that as a true strength." *Id*. at 243. This inconsistency suggests that plaintiff's effort, and not her neuropathy, is the cause of her weakness, and is a specific and legitimate reason to disregard Dr. Stover's opinion.

Dr. Stover's own May 5, 2015 function report gives reason to doubt neuropathy is the cause of plaintiff's symptoms. *See* AR 265 ("Peripheral neuropathy—with weakness. Neurology work-up including labs, MRI of brain and spine, EMG all negative. Symptoms disproportionate to severity of diabetes. Some inconsistency between history and exam findings—unclear etiology. ?psychosomatic/conversion disorder"). Furthermore, on May 1, 2015, just five days before issuing the function report, Dr. Stover reported a visit with plaintiff primarily to address her diabetes. AR 286. Dr. Stover assessed controlled type two diabetes, depression, and weakness. Regarding plaintiff's assessment for weakness, Dr. Stover noted, "as mentioned above I do believe that this may be a somatoform disorder given negative work-up for organic cause. Exam seems effort dependent- for example she cannot fully dorsiflex her feet against gravity but can ambulate without foot drop. Cannot grip my fingers but is able to carry a purse and a cane."

AR 288. To treat plaintiff's weakness, Dr. Stover suggested resuming physical therapy and to obtain treatment for depression, which is "likely contributing to her neuropathy/weakness . . . ." *Id.* While Dr. Stover opined that plaintiff suffered from neuropathy with fairly severe limitations, her own reports imply that plaintiff's neuropathy is not the cause of her limitations. *See* AR 286-88 and 265. Rather, the inconsistencies between plaintiff's presentation and her abilities suggest that her effort was the true cause of her weakness. This constitutes a specific and legitimate reason to disregard Dr. Stover's neuropathy diagnosis and related limitations in the May 5, 2015 function report. Therefore, the ALJ did not err in discounting the neuropathy diagnosis and related limitations assessed by Dr. Stover.

In sum, while the record contains some evidence of polyneuropathy, the substantial evidence in the record casts significant doubt as to whether plaintiff's polyneuropathy had more than a minimal effect on plaintiff's ability to work. Therefore, the ALJ did not err in finding plaintiff's polyneuropathy was not a severe impairment nor in choosing not to incorporate greater neuropathy related limitations into plaintiff's residual functional capacity (or "RFC").

### 2. The ALJ's Finding's regarding an Assistive Device and Plaintiff's RFC

The ALJ determined, in pertinent part, that plaintiff has the RFC to perform light work with some limitations related to working at heights and with some limitations in the ability to climb, stoop, kneel, crouch, and crawl. Light work as defined in in 20 CFR § 416.967(b) includes lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. A job in this category may require "a good deal of walking or standing . . . ." Plaintiff contends the ALJ's RFC analysis is flawed because it does not incorporate her need for an assistive device to stand and walk. She argues that her need for an assistive device is evident

from her use of a cane and a prescription for a rolling walker issued by her treating physician, Elizabeth Stover, MD, on May 1, 2015.

A. Cane

The ALJ acknowledged plaintiff's testimony regarding use of a cane prescribed by Dr. Stover, and a treatment note showing that plaintiff reported she sometimes needed to use a cane to walk. AR 17. However, the ALJ determined that while it was unclear if Dr. Stover prescribed the cane as medically necessary, Dr. Stover is now urging plaintiff to go to the gym or walk one half hour at a time.

Plaintiff, citing SSR 96-9P, argues the ALJ provided an inadequate basis to find an assistive device was not medically necessary. SSR 96-9P provides in pertinent part the following:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9P.

Plaintiff's cane related evidence does not meet this standard. Although plaintiff testified that her cane was prescribed by Dr. Stover roughly two years before the date of the hearing, AR 45, she has not cited medical documentation describing the circumstances for which a cane is needed. Her failure to do so runs contrary to SSR 96-9P. Furthermore, while Dr. Stover's encouragement to exercise is not necessarily inconsistent with the need for a cane, the ALJ properly gave little weight to the limitations assessed by Dr. Stover on account of the inconsistencies within her assessment as well as inconsistencies between her assessment and other clinical opinions. *See Supra*, section 1. This is a legitimate reason to discount the need for a

1   cane prescribed by Dr. Stover. In light of these reasons, the ALJ did not err in failing to

2   incorporate the need for a cane into plaintiff's RFC.

3       B.  <u>Rolling Walker</u>

4       Plaintiff next argues that her need for an assistive device is evident from a May 1, 2015

5   prescription for a rolling walker. However, this too fails to establish that use of an assistive

6   device was medically necessary under SSR 96-9P. The prescription does not describe the

7   circumstances for which the rolling walker is needed, *see* AR 312, and plaintiff has not cited

8   other documentation to establish the rolling walker's medical necessity under SSR 96-9P. While

9   the prescription suggests that it was issued regarding plaintiff's diagnosis of "Weakness," Dr.

10  Stover's treatment notes dated the same day as the prescription state that plaintiff's exam seemed

11  "effort dependent" and add that plaintiff's depression is "likely contributing to her

12  neuropathy/weakness . . . ." AR 288. These findings undercut the inference that the rolling

13  walker was medically necessary. Furthermore, there is a reasonable inference that Dr. Stover

14  prescribed the rolling walker for use of no more than four days. *See* AR 312. The prescription

15  lists a "Start Date" of May 1, 2015, and an "End Date" of May 4, 2015. *Id.*  The short duration of

16  use does not suggest ongoing need of a rolling walker. Lastly, as discussed above, the ALJ

17  properly gave little weight to the limitations assessed by Dr. Stover, and therefore had good

18  reason to discount the need of a rolling walker prescribed by Dr. Stover. Under these

19  circumstances, the ALJ did not err in choosing not to incorporate the need for an assistive device

20  into plaintiff's RFC.

21      Plaintiff counters that even if the prescription is somewhat vague, the ALJ was obliged at

22  the oral hearing to inquire further into the circumstances of the rolling walker's use. However, in

23  the case at hand, the ALJ adequately developed the record without inquiry into a rolling walker.

24

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)(internal citations omitted). Where the record, taken as a whole, is adequate to evaluate a claimant's alleged impairment, the ALJ's duty to develop the record is not implicated. *See id.*; *see also Baghoomian v. Astrue*, 319 Fed. Appx. 563, 566 (9th Cir. 2009).

Here, counsel was present to represent plaintiff's interests at the oral hearing. *See* AR 38. Plaintiff arrived to the hearing with a cane, and the ALJ inquired into plaintiff's use of a cane, AR 44, as well as her daily activities. AR 49. However, plaintiff never mentioned using a rolling walker. *See* AR 36-56. The only cited reference to a rolling walker is the May 1, 2015 prescription issued by Dr. Stover. The four-day length of the prescription, the lack of other references to a rolling walker, and the reasons to discount limitations assessed by Dr. Stover suggest the rolling walker prescription is not probative. Under these circumstances, the record was neither ambiguous nor inadequate to allow for proper consideration of the evidence.

Plaintiff also argues that the ALJ erred in finding that plaintiff could stand for the requisite time to perform light work. However, plaintiff advances no argument for this limitation independent from the arguments that the ALJ erred in assessing her neuropathy and her need for a cane or rolling walker. As neither argument succeeds, the ALJ did not err in choosing not to incorporate further limitations into plaintiff's RFC.

   3. **Whether there were Substantial Jobs available in the National Economy given Plaintiff's Limited English Proficiency.**

At the fifth and final stage of the disability determination process, the burden shifts to the Commissioner of the Social Security Administration to prove that the plaintiff can perform other

work in the national economy, given her age, education, RFC, and past work experience. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Work in the national economy means work existing in significant numbers either in the region where such individual lives or in several regions of the country. 42 U.S.C §423(d)(2)(B).

Plaintiff contends that the Vocational Expert ("VE") did not identify sufficient jobs plaintiff could perform in light of her English limitations.[1] The regulations provide that a person's ability to communicate in English is considered when evaluating what work, if any, she can do. 20 C.F.R. § 416.964(b)(5). Here, while the VE initially identified jobs without consideration of English limitations, the ALJ subsequently questioned the VE regarding jobs with a "sit/stand option at the sedentary or light level that have little or no English language requirement[.]" AR 62. The VE identified the job of final assembler, which requires unskilled, sedentary work, and has a language level of one. *Id.* According to the VE, a language level of one means an estimated first to third grade English level. *Id.* However, the VE clarified that these "language [requirements] may be pretty negligible[.]" *Id.* The VE testified that 30,000 positions for final assembler exist across the country, and 700 positions exist in Washington State. *Id.*

Plaintiff argues these do not constitute adequate numbers of jobs. However, plaintiff has not identified authority in which similar totals were found to be too few. *See* Dkt. 10 at 12-13. While the Ninth Circuit has not set out a bright line rule for what constitutes a "significant number" of jobs, 25,000 jobs nationwide has been found to represent a significant number of jobs in several regions of the country. *Gutierrez v. Commissioner of Social Sec.*, 740 F.3d 519, 528-529. As explained above, "work which exists in the national economy" can be satisfied by

---

[1] Plaintiff also argues that the VE failed to identify sufficient jobs in light of her need for an assistive device and limitation to sedentary work. However, as the ALJ did not err in determining plaintiff's physical RFC, further arguments with respect to her physical limitations are moot.

"work which exists in significant numbers *either* in the region where such individual lives *or* in several regions of the country." *Id. at 528* (internal citations and quotations omitted). Here, the VE identified at least 30,000 jobs nationwide that could be performed with English limitations. As this surpasses the 25,000 jobs nationwide the Ninth Circuit found "significant," the numbers of jobs relied upon by the ALJ were sufficient.

CONCLUSION

Based on these reasons and the relevant record, this matter is hereby **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

**JUDGMENT** should be for **DEFENDANT** and the case should be closed.

Dated this 9th day of January, 2019.


_____
J. Richard Creatura
United States Magistrate Judge